20

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**BROWNSVILLE DIVISION**

United States District Court
Southern District of Texas
FILED

JUL 0 2 2004

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| DIRECTV, Inc., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. |
| V. | ) | B-03-CV-0132 |
| | ) | |
| ALEX MEDRANO | ) | |
| | ) | |
| Defendant. | ) | |

**PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT BASED ON**
**UNCONTROVERTED DEEMED ADMISSIONS**

Plaintiff DIRECTV, Inc. ("DIRECTV") respectfully submits this Motion for Summary Judgment against Defendant, Alex Medrano ("Defendant").

## I. PRELIMINARY STATEMENT

DIRECTV brought this action against Defendant for purchasing, modifying and using equipment designed to intercept DIRECTV's satellite television programming without authorization. Defendant, by failing and/or refusing to respond to DIRECTV's requests for admission, has admitted each of the allegations for the purpose of this civil action. Based on the deemed admissions, there are no genuine issues of material fact. DIRECTV therefore is entitled to summary judgment.

## II. SUMMARY OF EVIDENCE

DIRECTV attaches hereto, and hereby incorporates by reference as if fully set forth in this motion for summary judgment, the following summary judgment evidence:

**EXHIBIT 1:**  Affidavit of James F. Whalen in support of summary judgment ("*Whalen Aff.*")

**EXHIBIT 2:**  True and correct copy of DIRECTV's Requests for Admissions to Alex Medrano served February 11, 2004 and again on May 24, 2004 and deemed admitted due to Defendant's non-response ("*Admissions*");

**EXHIBIT 3:**  Affidavit of Bill Gatliff in support of summary judgment, ("*Gatliff Affidavit*");

**EXHIBIT 4:**  True and correct copy of Court Order regarding the nature of the devices in question;

**EXHIBIT 5:**  True and correct copy of affidavit of Lecia Chaney and of Roni Sunderman in support summary judgment, deemed admissions, and attorneys fees;

## III. BRIEF STATEMENT OF FACTS

### A.    *Background Regarding DIRECTV's Operations And Description Of Defendant's Piracy Devices*

DIRECTV is the nation's leading direct broadcast satellite system, delivering over 225 channels of television and other programming to more than 12 million homes and businesses in the United States. **Exhibit 1**, (*Whalen Affidavit*, at 2). DIRECTV's television programming currently includes major cable networks, studio movies and special events programming, as well as a variety of sports and other special interests programming. *Id.* DIRECTV, a California company, has incurred significant expense to develop its direct broadcast satellite system. *Id.* at 3.

DIRECTV encrypts – electronically scrambles – its satellite transmissions to provide security for and prevent unauthorized viewing of its satellite television programming. **Exhibit 1**, (*Whalen Affidavit*, at 2). DIRECTV offers a variety of

monthly-pay subscription packages and offers pay-per-view, sporting and special event programming that can be purchased on an individual basis. *See* **Exhibit 1**, (*Whalen Affidavit*, at 2-3). DIRECTV's television programming currently includes broadcasts from major cable networks, studio movies and special events programming, as well as a variety of sports and other special interests programming. *Id.* DIRECTV offers its television programming to residential and business customers on a subscription and pay-per-view basis through the use of a satellite dish (mounted to the exterior of the business or residence) and an integrated receiver/decoder ("IRD") which usually sits near a television monitor used to view programming. *Id. See also,* **Exhibit 3**, (*Gatliff Affidavit* at handwritten page 5.) The IRD is used in the process of decoding DIRECTV's incoming signal. *Id.* The IRD typically includes a DIRECTV access card containing an embedded computer chip. **Exhibit 3**, (*Gatliff Affidavit* at handwritten page 6.) This chip functions to control which DIRECTV channels the subscriber receives (based on their subscription) and captures the user's pay-per-view purchases for later billing. *Id.* After the satellite dish and IRD are installed and the user calls DIRECTV to subscribe, DIRECTV can then electronically "activate" the user's account through satellite transmissions to the access card. **Exhibit 3**, (*Gatliff Affidavit* at handwritten page 5-7.) See also, **Exhibit 1** (*Whalen Affidavit*, at 2.) Upon activation of the access card by DIRECTV, the customer can receive and view in a decrypted format (*i.e.,* unscrambled) those channels to which the customer has subscribed or otherwise made arrangement to purchase from DIRECTV. *Id.*

Several individuals and companies have engaged in the manufacture and sale of illegal equipment used to circumvent DIRECTV's encryption technology. On July 25, 2001, DIRECTV executed Writs of Seizure, with the assistance of law enforcement, at the mail shipping facility, PCE & Associates, used by major sources of pirate technologies, including Aryatech and Canadian Security and Technology. **Exhibit 1** (*Whalen Affidavit*, at 8-9.) During and subsequent to the raids, DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, credit card receipts and other records. *Id.* Those records evidence defendant's purchases of illegal Pirate Access Devices. *Id.* PCE & Associates was physically located in Oviedo, Florida, but due to the expansive reach of internet sales, Aryatech and Canadian Security and Technology were able to conduct business nationwide and across many countries. *Id.* Aryatech's and Canadian Security and Technology's business enterprise focused on distributing electronic devices primarily designed for the surreptitious interception of satellite communications broadcast by DIRECTV. *Id.*

DIRECTV's raid revealed information related to Aryatech's and Canadian Security and Technology's customers. *Id.* DIRECTV obtained various business records evidencing the ongoing illegitimate enterprise, including orders, invoices, electronic communications, shipping documentation, purchase receipts, credit card receipts and customer lists. *Id.* Each record confirmed the existence of a distribution source for the country-wide transmission of devices primarily designed for the unauthorized interception of DIRECTV's Satellite Programming. *Id.* Aryatech's and Canadian

Security and Technology's customers ordinarily placed orders over various websites including www.Aratech.com and www.Cansat2000.com. *Id.*

Pertinently, the business records obtained in the raid evidence Defendant's purchase of Pirate Access Devices from Canadian Security and Technology. *Id.* Defendant's purchases consisted of a device known as an unlooper and a device known as a programmer. *Id. See also* **Exhibit 2**, (*Admissions*, at 4)(Request No. 5 through 6). Unloopers are used to repair DIRECTV access cards that have been rendered unusable by DIRECTV's electronic security measures, otherwise called electronic counter measures or "ECMs." **Exhibit 3**, (*Gatliff Affidavit*, at handwritten 10-13). An ECM is sent electronically by DIRECTV by satellite and is designed to disable DIRECTV access cards that are being used to obtain DIRECTV programming without payment. **Exhibit 3**, (*Gatliff Affidavit*, at handwritten 10). Once these cards are disabled, (or are "looped" as the condition is known), they no longer allow free viewing of DIRECTV programming without the use of other electronic devices or equipment. Individuals interested in continuing the illegal receipt of DIRECTV programming can use an unlooper to restore functionality to a disabled card. **Exhibit 3**, (*Gatliff Affidavit*, at handwritten 11-13). Unloopers have uniformly been held to be primarily designed to illegally receive and decrypt DIRECTV's satellite television programming. *See e.g., DIRECTV, Inc. v. Trone*, No. CV 02-05194 PA (RCx), slip op. (C.D. Cal. Feb. 10, 2003), attached hereto as **Exhibit 4**. The programmer purchased by Defendant Medrano is designed and/or marketed to be used to permit the illegal programming of – writing of code to – valid DIRECTV access cards for the sole purpose of obtaining access to DIRECTV Satellite Programming

without paying DIRECTV. **Exhibit 3**, (*Gatliff Affidavit*, at handwritten 9); **Exhibit 1** (*Whalen Affidavit*, at 10.)

## B.    *Deemed Admissions Establish Defendant's Liability*

On February 11, 2004 and again on May 24, 2004 DIRECTV served requests for admission on Defendant. *See* **Exhibit 5**, (*Chaney affidavit,* at 1). Responses to the requests for admission were due on March 12, 2004 and June 28, 2004, respectively. FED. R. CIV. P. 36. Defendant has failed or refused to respond to such requests for admission. **Exhibit 5**, (*Chaney affidavit,* at 1). Accordingly, the Requests for Admissions are deemed admitted by operation of law. FED. R. CIV. P. 36(a); *Hulsey v. Texas*, 929 F.2d 168, 171 (5th Cir. 1991). More importantly, the deemed admissions expressly and conclusively establish that:

(1) Defendant purchased and received an unlooper device and a programmer device in June of 2001 from Canadian Secuirty/PCE & Associates; **Exhibit 2**, (*Admissions*, at 4-5 Requests for Admission No. 5,6 and 8);

(2) the unlooper and the programmer purchased by Defendant were primarily designed for the purpose of assisting in the unauthorized reception of DIRECTV satellite programming; **Exhibit 2**, (*Admissions*, at 5, Request for Admission No. 7);

(3) Defendant knew that the purpose of the devices in question were to facilitate the interception of DIRECTV programming; **Exhibit 2**, (*Admissions*, at 5, Request for Admission No. 14);

(4) Defendant used the devices to gain illegal access to DIRECTV programming; **Exhibit 2**, (*Admissions*, at 7, Requests for Admission No. 10 and 11);

As the Defendant's liability is established, this Court is authorized to award statutory damages, attorney's fees and costs as provided by statute.

## IV. ARGUMENT FOR SUMMARY JUDGMENT ON ADMISSIONS

### A. *Summary Judgment Standard.*

Summary judgment is properly entered when the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party has the initial responsibility to identify materials in the record it believes demonstrate the absence of a material issue of fact. *See Celotex*, 477 U.S. at 323. Importantly, DIRECTV may rely on party admissions to support summary judgment. *Hulsey*, 929 F.2d 168, 171 (5th Cir. 1991).

In this case, the undisputed evidence shows that Defendant purchased and obtained an "unlooper" and a "programmer" from Canadian Security/PCE & Associates, which are devices designed and used specifically for the purpose of intercepting the satellite television programming broadcast by DIRECTV without authorization. Exhibit 2, (*Admissions*, at 5, Request for Admission No. 7). Moreover, the evidence conclusively establishes that Defendant *used* both of the devices purchased June 21, 2001 to gain unauthorized access to DIRECTV programming for. Exhibit 2, (*Admissions*, at 4-5, Requests for Admission No. 3, 9-11, 14). DIRECTV is entitled to damages of no less than $10,000.00, plus attorney's fees and costs incurred in the prosecution of this matter. This

evidence alone removes any genuine issues of material fact and is sufficient to entitle

DIRECTV to summary judgment against Defendant as a matter of law.

**B.**    **_Defendant Violated Several Statutes By Using and Modifying Pirate Devices._**

Defendant violated subsection (a) of 47 U.S.C. § 605 ("Section 605") by

misappropriating protected communications.    Likewise, the deemed admissions

conclusively establish Defendant's illicit interception of DIRECTV's communications

which constitutes a violation 18 U.S.C. § 2511 (made actionable by 18 U.S.C. § 2520

("Section 2520")), and Chapter 123 of the Texas Civil Practices and Remedies Code

("Chapter 123").    Additionally, Defendant violated subsection (e)(4) of Section 605 by

unlawfully modifying devices (namely DIRECTV's access card).    In sum, DIRECTV's

Section 605(a), Section 2520 and Chapter 123 violations are based on Defendant's

**_unauthorized reception_** of DIRECTV programming using equipment designed and

intended to aid in the surreptitious interception of DIRECTV's satellite television

programming.[1]  DIRECTV's Section 605(e)(4) claim arises through Defendant's additional

affirmative steps taken to **_modify DIRECTV equipment_** conclusively shown by

Defendant's admitted use of the devices he purchased to modify his DIRECTV access

card.[2]    Due to Defendant's violations, Defendant is liable to DIRECTV for statutory

---

1 Section 605(a) is violated through unauthorized reception of protected communications. 47 U.S.C. § 605(a). Section 2520 provides a cause of action against any person who acts in violation of Section 2511 to any person whose communication is used, disclosed or intentionally intercepted. *See* 18 U.S.C. § 2520; Chapter 123 prohibits interception or even attempted interception of protected communications. TEX. CIV. PRAC. & REM. CODE 123.002(a)(1).

2 Section 605(e)(4) prohibits, among other things, the modification of devices that will assist in the surreptitious interception of protected communications. 47 U.S.C. § 605(e)(4).

damages.  The uncontroverted evidence in this case demonstrates that DIRECTV is entitled to judgment as a matter of law.

### C.   *DIRECTV Is Entitled To Summary Judgment For A Minimum Of $10,000.00, Plus Reasonable Fees and Costs.*

DIRECTV requests and is entitled to statutory damages for the Defendant's uncontroverted violations.  Under the statutes at issue, the Court assesses damages based upon the statutory structure that Congress and the Texas Legislature enacted. *See* 47 U.S.C. § 605(e)(3)(C)(i)(II); 18 U.S.C. § 2520(c)(2); Tex. Civ. Prac. & Rem. Code § 123.004(2) Based on that structure, DIRECTV is entitled to no less than $10,000.00 in statutory damages, $3,893.50 in attorney's fees, and $288.88 in costs against Defendant.

Section 2520 provides that the Court may award to a complaining party damages against a Defendant for conduct prohibited by Section 2511 as follows:

(1)   statutory damages of *whichever is greater* of $100 for each day of violation or $10,000, 18 U.S.C. § 2520(c)(2)(B)(emphasis added);

(2)   punitive damages in appropriate cases, 18 U.S.C. § 2520(b)(2), and

(3)   reasonable attorney's fees and other litigation costs reasonably incurred, 18 U.S.C. § 2520(b)(3).

Accordingly, statutory damages should be awarded in an amount no less than $10,000.00.

Alternatively, subsection (e) of Section 605 provides DIRECTV civil remedies for Defendant's modification of devices in this case and states, in pertinent part, that an aggrieved party such as DIRECTV may recover the following damages:

(e)(3)(C)(i)(II) . . . for each violation of [paragraph (e)(4)] involved in the action an aggrieved party may recover statutory damages in a sum *not less than* $10,000 or more than $100,000, as the Court considers just . . . ."

(e)(3)(B)(iii) the court *shall* direct the recovery of full costs, including awarding reasonable attorneys' fees to an aggrieved party who prevails.

47 U.S.C. § 605(e)(4)(emphasis added).  Moreover, *each separate device is considered a separate violation*. 47 U.S.C. § 605(e)(4).  The use of unloopers to reprogram DIRECTV access cards requires a "modification" of the DIRECTV access card. *See* **Exhibit 3**, (*Gatliff Affidavit*, at handwritten 11-13).  Thus, DIRECTV is entitled to statutory damages against Defendant for no less than $20,000.00 or more than $100,000.00, for Defendant's violation of 47 U.S.C. § 605(e)(4).

Similarly, TEX. CIV. PRAC. & REM. CODE §123.004 states that the statutory remedies for violations of 123.002 are as follows:

". . . statutory damages of $10,000 *for each occurrence*. . . ." (TEX. CIV. PRAC. & REM. CODE §123.004(2));

". . . all actual damages in excess of $10,000. . . ." (TEX. CIV. PRAC. & REM. CODE §123.004(3));

". . . punitive damages in an amount determined by the court or jury. . . ." (TEX. CIV. PRAC. & REM. CODE §123.004(4)); and

". . . reasonable attorney's fees and costs. . . ." (TEX. CIV. PRAC. & REM. CODE §123.004(5));

Each of the statutes violated by Defendant provides that DIRECTV should recover its attorney's fees and costs and should recover damages of no less than $10,000.00 per violation.  Further, Defendant used at least two devices to intercept DIRECTV's programming without authorization and each of those uses constitutes a separate violation

of Section 605 (a) and the Texas Civil Practice and Remedies Code. Therefore, DIRECTV is entitled to damages, in the minimum, of $20,000.00 for violations of those statutes and a minimum of $10,000.00 for violations of Section 2511. DIRECTV has incurred approximately $3,893.50 in attorney's fees and $288.88 in costs associated with the prosecution of this matter. **Exhibit 5**, (*Chaney Affidavit, Sunderman Affidavit*).

There is no genuine issue of material fact to prevent this Court from concluding, at a minimum, that Defendant violated Section 605(a); Section 2511 (as made actionable by Section 2520) and Tex. Civ. Prac. & Rem. Code §123.001 *et seq*. Alternatively, there are no material facts in dispute that Defendant committed at least one willful statutory violation of 47 U.S.C. § 605(e)(4) by "modifying" devices while knowing that the device is primarily designed for surreptitious access to DIRECTV satellite programming. As such, this Court is authorized to award, and DIRECTV is entitled to receive statutory damages determined by the Court, in an amount no less than $20,000.00 under Section 605 (a) and the Texas Civil Practice and Remedies Code, or $10,000.00 under any of the numerous communication statutes violated by Defendant.

**D.   *DIRECTV Is Entitled To Summary Judgment On Its Claim For Injunctive Relief.***

DIRECTV requests injunctive relief under the express provisions of Section 605 Section 2520 and Tex. Civ. Prac. & Rem. Code § 123.004(1). Section 605 provides as follows:

> The court may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a) of Section 605.

*See* 47 U.S.C. § 605(e)(3)(B)(i). The pertinent language under Section 2520 provides that the Court may award, "such preliminary and other equitable or declaratory relief as may be appropriate." *See* 18 U.S.C. § 2520(b)(1). Likewise, the Texas statute provides that the Court may award "an injunction prohibiting a further interception, attempted interception, or divulgence or use of information obtained by an interception." *See* TEX. CIV. PRAC. & REM. CODE §123.004(1). Accordingly, this Court is authorized to permanently enjoin Defendant, his employees, agents, servants, successors and assigns, and any other person acting in concert with any of them, from committing or assisting in the commission of any violation of 47 U.S.C. § 605, violations of 18 U.S.C. § 2511 and violations of Tex. Civ. Prac. & Rem. Code § 123.001 *et seq* and should do so to prevent such violations.

## V. **PRAYER**

For the foregoing reasons, DIRECTV, Inc. respectfully requests that this Court grant its Motion for Summary Judgment against Defendant, Alex Medrano, and that the Court award DIRECTV, Inc. statutory damages in an amount no less than $20,000.00 under Section 605 (a) and the Texas Civil Practice and Remedies Code or, alternatively, $10,000.00 for violations of any of the statutes violated by the Defendant, plus reasonable attorney's fees and costs, that the Court grant DIRECTV's request for injunctive relief, and that the Court grant such other legal or equitable relief to which DIRECTV, Inc. may show itself entitled.

Respectfully submitted,

By: _____

**Lecia L. Chaney**
State Bar No. 00785757
Fed. I.D. #16499
**Christopher E. Moore**
State Bar No. 24011075
Fed. I.D. #

1201 E. Van Buren St.
P.O. Box 2155
Brownsville, Texas 78522
Telephone:  (956) 542-7441
Telefax     :  (956) 541-2170

## **<u>CERTIFICATE OF SERVICE</u>**

I, Lecia Chaney, attorney for DIRECTV, Inc., do hereby certify that I have this day served a true and correct copy of the above and foregoing instrument by mailing same via regular mail and certified mail to the following parties:

Alex Medrano                              *(Via Certified and Regular Mail)*
FM 506 , Box 614
La Feria,  TX  78559
**Pro se defendant**

SO CERTIFIED this the _____ day of July, 2004.

Lecia Chaney

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## BROWNSVILLE DIVISION

DIRECTV, Inc.,                           )
                                         )
        Plaintiff,                       )
                                         )          **Civil Action No.**
V.                                       )          **B-03-CV-0132**
                                         )
ALEX MEDRANO                             )
                                         )
        Defendant.                       )

## AFFIDAVIT SUPPORTING SUMMARY JUDGMENT AGAINST ALEX MEDRANO

BEFORE ME, the undersigned authority, on this day personally appeared James F. Whalen, who is personally known unto me, and being first duly sworn according to law, upon his oath, deposed and said:

My name is James F. Whalen. I am over twenty-one (21) years of age. I am a Senior Director in the Office of Signal Integrity for DIRECTV, Inc. ("DIRECTV"). In that position, I have been responsible for investigating reports of satellite signal theft involving the DIRECTV satellite system. Over the past three years, I have led or overseen several hundred investigations of individuals and businesses engaged in the design, manufacture, distribution and sale of pirate access cards and other devices intended to facilitate the unlawful reception and decryption of DIRECTV's satellite transmissions. I am familiar with the usual and customary business practices involved in all aspects of DIRECTV's investigations of individuals and businesses suspected of



illegally obtaining access to DIRECTV programming and the damages that illegal interception causes to the company.

DIRECTV is the nation's leading direct broadcast satellite programming provider, delivering over 225 channels of television and other programming to more than 12 million customers in the United States. DIRECTV satellite programming currently includes major cable networks, local stations, studio movies and special events programming, as well as a variety of sports and other special interest programming. DIRECTV has invested billions of dollars to develop its direct broadcast satellite system. DIRECTV encrypts — electronically scrambles — its satellite transmissions to provide security for and prevent unauthorized viewing of its satellite television programming. DIRECTV offers its television programming to residential and business customers on a subscription and pay-per-view basis only. Each customer obtains DIRECTV satellite hardware (including a DIRECTV receiver and a small satellite dish), is provided with a DIRECTV Access Card and is required to establish an account with DIRECTV. Upon activation of the Access Card by DIRECTV, the customer can receive and view in a decrypted format (*i.e.*, unscrambled) those channels to which the customer has subscribed or otherwise made arrangement to purchase from DIRECTV.

DIRECTV offers several different satellite television packages. DIRECTV offers 40 premium movie channels, including several Home Box Office®, Showtime®, Cinemax®, Movie Channel® and Encore® channels, the Family Pack™ and local channels for many markets throughout the United States. Importantly, DIRECTV targets

2

individuals interested in specialized sports packages and offers subscriptions to those specialized sporting packages, including professional football, basketball, hockey, baseball, and soccer as well as college football and basketball. Each of these packages can be purchased independent of the basic subscription fee. DIRECTV also offers specialized one-time viewing movies and events in the form of pay-per-view channels, countless pay-per-view boxing and special event matches. Acquiring the rights to distribute all of this television programming results in a significant expense to the company. For that reason, DIRECTV diligently protects its distribution rights.

## Plaintiff DIRECTV's Anti-Piracy Efforts

Addressing piracy is the job of several departments and many individual employees and independent contractors, experts and attorneys retained by DIRECTV. The Office of Signal Integrity, the engineering department, the legal department and the End-User Development Group are primarily responsible for DIRECTV's anti-piracy efforts.

DIRECTV has gone to great expense to create the Office of Signal Integrity and staff it with personnel to investigate the theft of DIRECTV satellite programming services. In addition to the cost of a permanent, full-time investigative staff, DIRECTV has, on a case-by-case basis, contracted with private investigators to assist in its investigations into allegations of signal theft. The Office of Signal Integrity also supports law enforcement agencies such as the Federal Bureau of Investigation and state law

3

enforcement agencies in their investigations of cases involving theft of satellite television services.

The availability of piracy devices has resulted in technical efforts by DIRECTV to address the piracy problem. One technical effort is to replace older, compromised Access Cards with new, secure cards. The costs associated with designing and manufacturing replacement access cards and sending those replacement cards to existing customers are substantial. DIRECTV's engineering department coordinates this effort.

DIRECTV periodically transmits Electronic Counter Measures ("ECMs"), which are electronic signals sent through the data stream to disable illegal access cards. This requires the expenditure of funds to purchase sample illegal devices from the pirate marketplace for testing, and the devotion of engineering time to write the software for, test and implement the ECM. To date, DIRECTV has not quantified these expenditures, but they are significant.

The engineering department also maintains a forensic laboratory to test and evaluate pirate devices seized by law enforcement agencies or obtained by DIRECTV investigators.

In addition to the costs associated with the efforts mentioned above, DIRECTV pursues its anti-piracy efforts through civil litigation against satellite pirates. DIRECTV has filed hundreds of lawsuits against individuals and business entities in the United States, Canada and Mexico engaged in the business of designing, manufacturing and distributing pirate access devices designed for use with DIRECTV systems. Through

4

these lawsuits, DIRECTV has also shut down hundreds of Internet websites operating with the purpose of distributing illegal devices, software and instructions intended to be used with such devices.

DIRECTV also executes civil raids on individuals and entities involved in piracy. DIRECTV also seeks to stop device manufacture by interrupting the market for purchases of pirate devices through its demand letters and negotiation process.

DIRECTV created the End-User Development Group to pursue end-users of pirate devices and negotiate settlements of DIRECTV's claims against such individuals. The End-User Development Group has sent demand letters and negotiated settlements with tens of thousands of users of illegal devices. Since a pre-litigation settlement cannot be reached in every case, DIRECTV has filed lawsuits against thousands of end-users of illegal devices.

Each of the measures described above costs DIRECTV money that it would not have to spend were it not for piracy.

### Costs of Piracy to DIRECTV

The business of piracy can be a lucrative endeavor both for the large manufacturer and the small dealer. Records obtained pursuant to raids in Canada and in the United States show that pirates have generated substantial revenues from the distribution and manufacture of illegal access devices, often amounting to millions of dollars for an individual distributor of pirate devices. Obviously, there is a substantial black market for

5

pirate access devices used in conjunction with DIRECTV systems, and DIRECTV is pursuing all available avenues to curtail those sales.

Piracy itself affects DIRECTV immeasurably. An individual using one pirated access card has access to over a million dollars worth of programming services annually. While this includes the purchase price of every program broadcast on each channel every day, the value of subscription and movies viewed only once is well over $150,000 annually.

DIRECTV has also calculated the value of programming purchased by the typical DIRECTV high-end legitimate customer (top 10% of subscribers to our Total Choice Premier package). This approach is based on the assumption that the typical user of a modified access card or other signal theft device would view at least the same amount of programming as the typical high-end paying customer. In fact, since there is no DIRECTV hardware or subscription costs associated with viewing programming, it seems more likely that the user of the illegal access device would make significantly greater use of DIRECTV's proprietary programming than would the honest subscriber who pays for each channel he uses. Those who invest hundreds of dollars in illegal devices and software can be expected to view a significant amount of television programming. Anecdotal information obtained by DIRECTV suggests that users of modified access cards are heavy consumers of sports subscriptions, pay-per-view movies and events (such as boxing matches), and adult programming.

6

The average monthly bill sent to the top 10% of DIRECTV's legitimate customers for the accounting period June 15, 2000 to July 14, 2000 was $204.56. This included both subscription and pay-per-view charges. Assuming a user of a modified access card would view as much programming as a typical high-end paying customer, the annual value of programming stolen by such a user would be $2,454.72, (12 x $204.56).

While DIRECTV has gone to significant efforts to acquire programming distribution rights from program providers, any loss of confidence by such providers in the security of DIRECTV's signal may affect DIRECTV's ability to obtain those rights in the future as they are periodically renewed and renegotiated.

Incremental increases in programming costs due to security concerns are directly related to satellite piracy. Moreover, the use of illegally modified access cards also adversely affects DIRECTV dealers in the United States who rely on commissions from the sale of DIRECTV programming. Because the use of a modified access card or other signal theft device allows the owner to obtain "free" DIRECTV programming, there is no need to subscribe to DIRECTV. The absence of subscriptions means that DIRECTV dealers do not receive commission checks. Similarly, dealers receive charge-backs on their pre-paid commissions if DIRECTV programming is not activated for the hardware sold by the dealers.

DIRECTV does not maintain records that would demonstrate the actual profit, if any, realized on the monthly fees paid by any individual subscriber. While the margin of "profit" is generally known with respect to particular subscription packages, this figure

does not take into account the substantial investment costs in technology, including the fleet of satellites and the broadcast system itself, corporate overhead, subscriber acquisition costs (*i.e.,* sales commissions, equipment subsidies, marketing and advertising costs) and other expenses that would be relevant to a calculation of profit. Rather, it is simply a gross comparison of the price paid for the particular programming by DIRECTV and the charge to the customer for a package that contains that particular programming. Furthermore, this type of programming cost information is very closely guarded, proprietary information that is the subject of extensive security measures and contractual confidentiality provisions. In the event the Court wishes to know this information in connection with this case, DIRECTV requests that an opportunity be given to submit information for strictly *in camera* inspection that would not become part of the public record.

### Defendant's Purchase

On July 25, 2001, DIRECTV executed Writs of Seizure, with the assistance of law enforcement, at the mail shipping facility, PCE & Associates, used by major sources of pirate technologies, including Aryatech and Canadian Security and Technology. Pursuant to lawsuits against the distributors of pirate access devices , DIRECTV came into possession of a substantial body of sales records, shipping records, email communications, credit card receipts and other records. Those records evidence defendant's purchases of illegal Pirate Access Devices. PCE & Associates was physically located in Oviedo, Florida, but due to the expansive reach of internet sales, Aryatech and

Canadian Security and Technology were able to conduct business nationwide and across many countries. Aryatech's and Canadian Security and Technology's business enterprise focused on distributing electronic devices primarily designed for the surreptitious interception of satellite communications broadcast by DIRECTV.

DIRECTV's raid revealed information related to Aryatech's and Canadian Security and Technology's customers. DIRECTV obtained various business records evidencing the ongoing illegitimate enterprise, including orders, invoices, electronic communications, shipping documentation, purchase receipts, credit card receipts and customer lists. Each record confirmed the existence of a distribution source for the country-wide transmission of devices primarily designed for the unauthorized interception of DIRECTV's Satellite Programming. Aryatech's and Canadian Security and Technology's customers ordinarily placed orders over various websites including www.Aryatech.com and www.Cansat2000.com. Pertinently, the business records obtained pursuant to the raid, evidence each defendant's purchases of Pirate Access Devices from Aryatech and/or Canadian Security and Technology, and in reliance on those records and other information, and upon information and belief, DIRECTV brings this lawsuit against the defendant for his purchase, possession, modification, manufacture, assembly, and/or use of Pirate Access Devices.

Defendant, Alex Medrano, purchased no fewer than two (2) pirate access devices from Canadian Security and Technology. Defendant Medrano placed each order using interstate or foreign wire facilities and received orders through the United States Postal

Service or commercial mail carrier.  Specifically, on or about June 21, 2001, Defendant Medrano purchased a device invoiced as a "MKI Cobalt Programmer."  Additionally, on that same day, Defendant Medrano purchased a device invoiced as a "MKII Cobalt Unlooper."  The devices were shipped to Defendant Medrano at Defendant's address in La Feria, Texas.

The unlooper purchased by Defendant Medrano is designed to restore functionality to illegally modified DIRECTV access cards that were disabled by misuse or by DIRECTV's electronic security measures commonly referred to as ECMs.

The programmer purchased by Defendant Medrano is designed and/or marketed to be used to permit the illegal programming of – writing of code to – valid DIRECTV access cards for the sole purpose of obtaining access to DIRECTV Satellite Programming without paying DIRECTV.

Upon all reasonable likelihood, Defendant Medrano used the devices purchased from Canadian Security and Technology to facilitate the unauthorized viewing of DIRECTV programming without payment.

Based on this information, DIRECTV seeks and should be awarded minimum statutory damages of $10,000.00 for the violations of 18 U.S.C. §2520 as alleged in the Complaint.

Alternatively, based on this information, DIRECTV seeks and should be awarded minimum statutory damages of $10,000.00 for the violations of 47 U.S.C. § 605(a).

10

Alternatively, based on this information, DIRECTV seeks and should be awarded statutory damages of $10,000.00 for the violations of TEX. CIV. PRAC. & REM. CODE § 123.001 *et. seq.*

Moreover, from this time forward, defendant, Alex Medrano should be permanently enjoined from committing or assisting in commission of any violation of the Cable Communications Policy Act of 1934 as amended, 47 U.S.C. §605, § 605(e)(4), and 18 U.S.C. §2511.

FURTHER, AFFIANT SAITH NOT

_____
James F. Whalen

SUBSCRIBED AND SWOR TO BEFORE ME, on this the _20th_ day of MAY 2004, to certify which witness my hand and official seal.

_____
NOTARY PUBLIC in and for
The State of California



CAROL J. HALL
Commission # 1394622
Notary Public - California
Los Angeles County
My Comm. Expires Jan 18, 2007

11

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### BROWNSVILLE DIVISION

DIRECTV, Inc., §
     **Plaintiff,** §
§
v. §
§    **CIV. No. B-03-132**
§
**ALEX MEDRANO** §
     **Defendant.** §
§

## PLAINTIFF, DIRECTV, INC.'S REQUEST FOR ADMISSIONS
## TO DEFENDANT, ALEX MEDRANO

TO:   Defendant, ALEX MEDRANO, Pro Se,
      Alex Medrano
      FM 506, Box 614
      La Feria, Tx  78559

Pursuant to Federal Rule of Civil Procedure 36, Plaintiff DIRECTV, Inc., hereby requests that you answer the following Request for Admissions.

Dated this 11th day of February, 2004.

Respectfully submitted,

RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.

By: _Lecia Chaney_____
     **Lecia L. Chaney**
     State Bar No. 00785757
     Fed. I.D. #16499
     **Christopher E. Moore**
     State Bar No. 24011075
     Fed. I.D. #36611

1201 E. Van Buren St.
P.O. Box 2155
Brownsville, Texas 78522
Telephone:  (956) 542-7441
Telefax   : (956) 541-2170


EXHIBIT
2

DIRECTV'S REQ. FOR DISCLOSURE TO DEFENDANT          PAGE 1

Sent out by fascimile, on 2-11-04

OF COUNSEL:

GREER, HERZ & ADAMS, LLP

**Joe A.C. Fulcher**
Federal ID No. 14126
St. Bar No. 07509320
**Kelly-Ann F. Clarke**
Federal ID No. 27195
St. Bar No. 24027929
**Robert A. Swofford**
Federal ID No. 19403
St. Bar No. 00791765
**Joseph R. Russo, Jr.**
Federal ID No. 22559
St. Bar No. 24002879
One Moody Plaza, 18th Floor
Galveston, Tx  77550
(409) 797-3200 (telephone)
(409) 766-6424 (telecopier)

## CERTIFICATE OF SERVICE

        I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record and Pro Se Defendant, to-wit:

Alex Medrano
FM 506, Box 614
La Feria, Tx  78559
*Pro Se*

by certified mail, return receipt requested, facsimile transmission, and/or hand delivery pursuant to the Federal Rules of Civil Procedure on this the 11th day of February, 2004.


_____
Lecia L. Chaney

## INSTRUCTIONS

1.    Pursuant to Court order and the Federal Rules of Civil Procedure, each Request for Admission is to be answered fully and separately, in writing and under oath, within thirty (30) days from the date of service.  Pursuant to Federal Rules of Civil Procedure 36, you are being served with the original of the Request for Admissions. Please type your answers on the original in the space provided following each Request for Admission, or use additional pages, if necessary.

2.    Please note that under Rule 36, any Request for Admission which is not the subject of a timely written response or objection signed by the party or the party's attorney shall be deemed admitted for purposes of the pending action.  Please further note the following provision of Federal Rule of Civil Procedure 36(a):

> The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.  An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.  A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.

> The party who has requested the admissions may move to determine the sufficiency of the answers or objections.  Unless the court determines that an objection is justified, it shall order that an answer be served.  If the court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served.  The court may, in lieu of these orders, determine that final disposition of the request be made at a pre-trial conference or at a designated time prior to trial.  The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

## DEFINITIONS

As used herein:

1.     The word "person" means any individual, firm, partnership, corporation, association, government agency or any other government-controlled business entity.  All references to persons or entities also include all persons and/or entities acting on their behalf.

2.     The terms "and" and "or" whenever used herein shall be understood in both the conjunctive and disjunctive sense, synonymous with "and/or."

3.     The words "you" and "yours" as used herein refer to the party these discovery requests are served upon, and his or her employees, agents, officers, attorneys and all other representatives in their capacities as such.  It is specifically intended that the definition of "you" and "yours" includes defendant's business names.

4.     The name "ALEX MEDRANO as used herein refers to the party upon whom these discovery requests are served, and his or her employees, agents, officers, attorneys, and all other representatives in their capacities as such.

5.     The name "DIRECTV" as used herein refers to Plaintiff DIRECTV, Inc.

## REQUEST FOR ADMISSIONS

1.     Admit that you are the same person as "Alex Medrano" named in this lawsuit.

2.     Admit that you are a resident of La Feria, Texas.

3.     Admit that you received and/or assisted others in receiving DIRECTV's satellite transmissions of television programming without authorization from or payment to DIRECTV.

4.     Admit that you knew or should have known that receiving and/or assisting others in receiving DIRECTV's satellite transmissions of television programming without authorization or payment to DIRECTV was illegal and prohibited.

5.     Admit that on or about June 21, 2001, you ordered certain products from Canadian Security/PCE & Associates.

6.    Admit that your order from Canadian Security/PCE & Associates on or about June 21, 2001 consisted of an MKI Cobalt Series ISO 7816 Programmer consisting of a smart card programmer and an MKII Cobalt Series ISO 7816 Unlooper.

7.    Admit that the product(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 had the primary design for and purpose of facilitating the unauthorized interception of DIRECTV's encrypted signal.

8.    Admit that you received the product(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001.

9.    Admit that you ordered the MKI Cobalt Series ISO 7816 Programmer consisting of a smart card programmer and an MKII Cobalt Series ISO 7816 Unlooper with the intent to use such device(s) to facilitate the unauthorized interception of DIRECTV's encrypted signal.

10.    Admit that you used or attempted to use one or more of the devices you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 to facilitate the unauthorized interception of DIRECTV's encrypted signal.

11.    Admit that you were successful in utilizing one or more of the devices you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 to facilitate the unauthorized interception of DIRECTV's encrypted signal.

12.    Admit that you used a credit card to pay for your order from Canadian Security/PCE & Associates on or about June 21, 2001.

13.    Admit that the device(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 was delivered to you "C.O.D." (cash on delivery) and that upon C.O.D. delivery, you paid for said devices.

14.    Admit that at the time you purchased the device(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001, you knew or should have known that such device(s) had the primary design for the purpose of unauthorized interception of DIRECTV's encrypted signal.

15.    Admit that you knew or should have known that the manufacture, assembly, distribution, sale and/or possession of the device(s) you purchased from Canadian Security/PCE & Associates on or about June 21, 2001 was illegal and prohibited.

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| DIRECTV, Inc., | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIV. No. **B-03-132** |
| | § | |
| ALEX MEDRANO | § | |
| Defendant. | § | |

### PLAINTIFF, DIRECTV, INC.'S REQUEST FOR ADMISSIONS TO DEFENDANT, ALEX MEDRANO

TO:    Defendant, ALEX MEDRANO, Pro Se,
Alex Medrano
Rt. 1, Box 226
614 FM 506
La Feria, Tx 78559

Pursuant to Federal Rule of Civil Procedure 36, Plaintiff DIRECTV, Inc., hereby requests that you answer the following Request for Admissions.

Dated this 24th day of May, 2004.

Respectfully submitted,

RODRIGUEZ, COLVIN, CHANEY & SAENZ, L.L.P.

By: _____
**Lecia L. Chaney**
State Bar No. 00785757
Fed. I.D. #16499
**Christopher E. Moore**
State Bar No. 24011075
Fed. I.D. #36611

1201 E. Van Buren St.
P.O. Box 2155
Brownsville, Texas 78522
Telephone: (956) 542-7441
Telefax   : (956) 541-2170

OF COUNSEL:

GREER, HERZ & ADAMS, LLP

**Joe A.C. Fulcher**
Federal ID No. 14126
St. Bar No. 07509320
**Kelly-Ann F. Clarke**
Federal ID No. 27195
St. Bar No. 24027929
**Robert A. Swofford**
Federal ID No. 19403
St. Bar No. 00791765
**Joseph R. Russo, Jr.**
Federal ID No. 22559
St. Bar No. 24002879
One Moody Plaza, 18th Floor
Galveston, Tx 77550
(409) 797-3200 (telephone)
(409) 766-6424 (telecopier)

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon all counsel of record and Pro Se Defendant, to-wit:

Alex Medrano
Rt. 1, Box 226
614 FM 506
La Feria, Tx 78559
*Pro Se*

by certified mail, return receipt requested, facsimile transmission, and/or hand delivery pursuant to the Federal Rules of Civil Procedure on this the 24th day of May, 2004.

Lecia L. Chaney

## INSTRUCTIONS

1.    Pursuant to Court order and the Federal Rules of Civil Procedure, each Request for Admission is to be answered fully and separately, in writing and under oath, within thirty (30) days from the date of service.  Pursuant to Federal Rules of Civil Procedure 36, you are being served with the original of the Request for Admissions. Please type your answers on the original in the space provided following each Request for Admission, or use additional pages, if necessary.

2.    Please note that under Rule 36, any Request for Admission which is not the subject of a timely written response or objection signed by the party or the party's attorney shall be deemed admitted for purposes of the pending action.  Please further note the following provision of Federal Rule of Civil Procedure 36(a):

The answer shall specifically deny the matter or set forth in detail the reasons why the answering party cannot truthfully admit or deny the matter. A denial shall fairly meet the substance of the requested admission, and when good faith requires that a party qualify an answer or deny only a part of the matter of which an admission is requested, the party shall specify so much of it as is true and qualify or deny the remainder.  An answering party may not give lack of information or knowledge as a reason for failure to admit or deny unless the party states that the party has made reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny.  A party who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; the party may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why the party cannot admit or deny it.

The party who has requested the admissions may move to determine the sufficiency of the answers or objections.  Unless the court determines that an objection is justified, it shall order that an answer be served.  If the court determines that an answer does not comply with the requirements of this rule, it may order either that the matter is admitted or that an amended answer be served.  The court may, in lieu of these orders, determine that final disposition of the request be made at a pre-trial conference or at a designated time prior to trial.  The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion.

## DEFINITIONS

As used herein:

1.    The word "person" means any individual, firm, partnership, corporation, association, government agency or any other government-controlled business entity. All references to persons or entities also include all persons and/or entities acting on their behalf.

2.    The terms "and" and "or" whenever used herein shall be understood in both the conjunctive and disjunctive sense, synonymous with "and/or."

3.    The words "you" and "yours" as used herein refer to the party these discovery requests are served upon, and his or her employees, agents, officers, attorneys and all other representatives in their capacities as such. It is specifically intended that the definition of "you" and "yours" includes defendant's business names.

4.    The name "ALEX MEDRANO as used herein refers to the party upon whom these discovery requests are served, and his or her employees, agents, officers, attorneys, and all other representatives in their capacities as such.

5.    The name "DIRECTV" as used herein refers to Plaintiff DIRECTV, Inc.


## REQUEST FOR ADMISSIONS

1.    Admit that you are the same person as Alex Medrano" named in this lawsuit.

2.    Admit that you are a resident of La Feria, Texas.

3.    Admit that you received and/or assisted others in receiving DIRECTV's satellite transmissions of television programming without authorization from or payment to DIRECTV.

4.    Admit that you knew or should have known that receiving and/or assisting others in receiving DIRECTV's satellite transmissions of television programming without authorization or payment to DIRECTV was illegal and prohibited.

5.    Admit that on or about June 21, 2001, you ordered certain products from Canadian Security/PCE & Associates.

6.    Admit that your order from Canadian Security/PCE & Associates on or about June 21, 2001 consisted of an MKI Cobalt Series ISO 7816 Programmer consisting of a smart card programmer and an MKII Cobalt Series ISO 7816 Unlooper.

7.    Admit that the product(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 had the primary design for and purpose of facilitating the unauthorized interception of DIRECTV's encrypted signal.

8.    Admit that you received the product(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001.

9.    Admit that you ordered the MKI Cobalt Series ISO 7816 Programmer consisting of a smart card programmer and an MKII Cobalt Series ISO 7816 Unlooper with the intent to use such device(s) to facilitate the unauthorized interception of DIRECTV's encrypted signal.

10.    Admit that you used or attempted to use one or more of the devices you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 to facilitate the unauthorized interception of DIRECTV's encrypted signal.

11.    Admit that you were successful in utilizing one or more of the devices you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 to facilitate the unauthorized interception of DIRECTV's encrypted signal.

12.    Admit that you used a credit card to pay for your order from Canadian Security/PCE & Associates on or about June 21, 2001.

13.    Admit that the device(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001 was delivered to you "C.O.D." (cash on delivery) and that upon C.O.D. delivery, you paid for said devices.

14.    Admit that at the time you purchased the device(s) you ordered from Canadian Security/PCE & Associates on or about June 21, 2001, you knew or should have known that such device(s) had the primary design for the purpose of unauthorized interception of DIRECTV's encrypted signal.

15.    Admit that you knew or should have known that the manufacture, assembly, distribution, sale and/or possession of the device(s) you purchased from Canadian Security/PCE & Associates on or about June 21, 2001 was illegal and prohibited.

IN THE STATE OF ILLINOIS §
§
COUNTY OF TAZEWELL §

## AFFIDAVIT OF BILL GATLIFF

BEFORE ME, the undersigned authority, on this day personally appeared Bill Gatliff, who is personally known to me, and being first duly sworn according to law, upon his oath, deposed and said:

1.     My name is Bill Gatliff. I am over twenty-one (21) years of age and reside in Illinois. I am an electrical engineer with a formal background in computer science and a decade of programming, teaching and business experience. Among other things, I work for Netrino, LLC ("Netrino"). Netrino is an engineering services company specializing in the design and analysis of embedded systems. Netrino has been retained by DIRECTV to provide expert testimony in relation to DIRECTV's claims. In connection therewith, experts working for Netrino, including myself, have reviewed publicly available information on methods of circumventing conditional access controls to illegally receive DIRECTV programming, publicly available information regarding smartcards (including ISO 7816 standards) and devices provided by DIRECTV. I personally have analyzed several different types of devices distributed by various vendors.

2.     It is the regular course of business of Netrino, L.L.C. to generate expert report and to maintain records concerning the expert reports it has generated. The reports are kept by Netrino, L.L.C. in the course of its regularly conducted business activities,

131202.1



and it is the regular course of business for an expert with Netrino, L.L.C. with knowledge

of the event, or from information transmitted by a person with knowledge of the event, to

create such expert reports at or near the time of the event or reasonably soon thereafter.

  3.  Attached to this affidavit as **Exhibit 1** are the complete reports (except that

schedule 1 is not attached) providing a description of the various devices typically

utilized by individuals seeking to gain unauthorized access to DIRECTV programming

and reports specific to the design and utility of devices at issue. The information

contained in these documents is hereby incorporated into this affidavit by reference as if

fully set forth herein. I have reviewed the devices, analysis and opinions provided in each

Netrino report attached hereto, I am in agreement with that analysis and opinion and

adopt each analysis and opinion regarding the devices provided in each document

attached as my own. In relation to an analysis of the marketing and intended utility of

devices such as those involved in this case, it is not uncommon to review and rely upon

advertising or website material relating to the marketing of the device in question.

  I declare under penalty of perjury that the foregoing is true and correct.

  FURTHER, AFFIANT SAITH NOT.

  Executed on this 28 day of _April_ , 2004.

             Bill Gatliff

SUBSCRIBED AND SWORN TO BEFORE ME, _Nancy Biagini_ on this _28th_ day of _April_ 2004, to certify which witness my hand and official seal.

_Nancy Biagini_

NOTARY PUBLIC IN AND FOR
THE STATE OF ILLINOIS

```
"OFFICIAL SEAL"
NANCY BIAGINI
Notary Public, State of Illinois
My Commission Exp. 05/03/2004
```

3

**EXPERT REPORT AND DISCLOSURES OF BILL GATLIFF OF NETRINO, LLC**

## I. Background

Netrino, LLC ("Netrino") is an engineering services company specializing in the analysis, design, and implementation of embedded systems.  Netrino has been retained by DIRECTV to provide expert testimony regarding technological aspects of DIRECTV piracy and the devices used in piracy of DIRECTV's satellite signals.  In connection therewith, experts working for Netrino have (1) examined and tested devices provided by DIRECTV; (2) reviewed publicly available information on methods of circumventing conditional access controls to receive DIRECTV programming without authorization and without paying for it, including the contents of various websites; (3) used devices provided by DIRECTV in conjunction with software tools from the DIRECTV pirate community to circumvent DIRECTV's conditional access controls; and (4) reviewed publicly available compilations of information including: the ISO7816-1/2/3 standards, the *Smart Card Handbook* (ISBN 0-471-98875-8), documentation available at *pcscworkgroup.com* relating to the PC/SC specification, the *Smart Card Developer's Kit* (ISBN 1-57870-027-2), and datasheets for relevant electronic components, including Atmel AVR microprocessors and digital logic chips from Phillips, Texas Instruments, and other companies.

The Netrino expert who is likely to testify is Bill Gatliff.  Attached hereto as Schedule 1 is Bill Gatliff's curriculum vitae, a list of all publications he has authored in the past 10 years, a disclosure of all matters in which he has provided trial or deposition

testimony in the past 4 years, and a disclosure of his compensation arrangement from
DIRECTV. The same compensation agreement shall apply for any defendant who
wishes to take testimony from the expert. Similar information is provided for Michael
Barr, Nigel Jones, and David Simon, other Netrino experts who have provided expert
analysis for DIRECTV on these devices and other devices, and who may be called upon
for testimony in the event of scheduling conflicts.

Reports that reflect the analysis of individual devices and the experts' opinions
are attached hereto as Schedule 2.

In addition, Netrino provides this overview of DIRECTV's conditional access
system and the various devices used by pirates to circumvent that system.

## II. General Opinions and Basis for Opinions

### A. DIRECTV's Conditional Access System

A DIRECTV system consists of a DIRECTV-compatible satellite dish, a DIRECTV
receiver, a DIRECTV access card, a television, and cabling to connect these components.
Together, these components convert DIRECTV's encrypted satellite signal broadcasts to
viewable programming that can be displayed on the attached television of a DIRECTV
customer.

A DIRECTV receiver (also known as an "integrated receiver/decoder," or "IRD")
is a device placed near the television that receives DIRECTV's encrypted signal from the
satellite dish. The IRD processes and decrypts incoming signals with assistance from an
authorized DIRECTV access card inserted into it. When there is no DIRECTV access
card inserted into the IRD or the inserted access card is unauthorized, no pay channels
are viewable on the television. When an authorized DIRECTV access card is inserted

5

into the IRD, only those channels that have been specifically subscribed to or purchased by the customer will be decrypted and made viewable.   See Figure 1.



*Figure 1.  The components of a DIRECTV system*

DIRECTV access cards are smartcards, which are similar in size and shape to credit cards but contain an embedded computer and memory.  DIRECTV's smartcards control access to programming; hence the name "access card."  DIRECTV's access cards contain DIRECTV-specific hardware and software that is designed to: (1) provide authorization to decrypt DIRECTV satellite broadcasts for customers who have subscribed to those services; and (2) record pay-per-view purchase records for later upload to DIRECTV for billing purposes.  A non-volatile memory device within the DIRECTV access card stores software and data, which may change during the life of the smartcard, but that survives even if electrical power is turned off.

A special part of the DIRECTV access card, known as the "Application Specific Integrated Circuit" ("ASIC"), plays a primary role in video decryption.  After the

6

Expert Report and Disclosures                                                    4/7/2004

software in the DIRECTV access card determines that the user is tuned to a channel that he is authorized to watch, it uses the ASIC to generate the decryption keys the IRD needs to decrypt the video signal.  The decryption keys change periodically, and DIRECTV broadcasts messages telling IRDs about these changes.  The IRD forwards these messages to the DIRECTV access card, which in turn sends them to the ASIC, which generates new decryption keys.  See Figure 2.



*Figure 2.  The role of the DIRECTV access card*

        DIRECTV has from time to time introduced new generations of their access cards and disabled older access cards.  The five generations of access cards issued to date are known as the P1 (also known as 'F,' because the serial numbers of those cards begin with the letter F), P2 (also known as 'H,' for the same reason), P3 (also known as 'HU'), P4, and D1 cards.  In our reports, we refer to these cards as P1, P2/H, P3/HU, P4, and D1.  Only the P3/HU, P4, and D1 access cards are currently able to receive DIRECTV's

7

Expert Report and Disclosures                                              4/7/2004

signals.  The P2/H access cards could be used to receive DIRECTV's signals until October, 2002.


### B. Devices Used For Piracy of DIRECTV's Satellite Broadcasts

Methods of DIRECTV Piracy

All known methods of receiving DIRECTV's signals without authorization from DIRECTV rely upon modifying the access card or its behavior in ways not authorized by DIRECTV.  We refer to this unauthorized use of the DIRECTV signal in our reports as "piracy."  Although DIRECTV uses various security measures to prevent piracy, there are numerous devices for sale to thwart these measures.  Some modifications to an access card permit the user to remove pay-per-view ("PPV") purchase records so that they will not be billed by DIRECTV for those purchases.  Other modifications provide the user access to all or most of the satellite programming provided by DIRECTV without authorization from DIRECTV and without payment to DIRECTV.

Individuals and businesses involved in facilitating piracy generally either (1) market and sell modified DIRECTV access cards to customers; or (2) market and sell devices for modifying DIRECTV access cards or their behaviors to allow them to gain access to DIRECTV programming without authorization.

Persons involved in piracy generally either (1) purchase and use a modified access card to intercept DIRECTV's programming without authorization; or (2) purchase devices to modify DIRECTV access card(s) already in their possession and then use the modified access card(s) to intercept DIRECTV's programming without authorization; or (3) purchase one or more devices to use in conjunction with a modified DIRECTV access card to intercept DIRECTV's programming without authorization.

Expert Report and Disclosures                                              4/7/2004

<u>Smartcard Readers</u>

Smartcard readers are devices that read data from and write data to ISO7816-compliant smartcards. They typically attach to a computer with a cable, often to the serial port or the USB port of the computer. There are many sources for smartcard readers, and many such devices sold by that name are legitimate products. Most legitimate smartcard readers comply with the PC/SC specification, which specifies how software running on various computers can communicate with a smartcard installed in a smartcard reader. Microsoft has encouraged developers writing smartcard software intended to work with its Windows operating systems to use the PC/SC specification.

Persons who wish to obtain DIRECTV programming without authorization are sometimes able to modify the nonvolatile memory contents of a DIRECTV access card with DIRECTV-specific piracy software and a compatible smartcard reader. Smartcard readers compatible with DIRECTV-specific piracy software are often marketed as "smartcard reader/writers" and "smartcard programmers." (Because reading a smartcard requires writing to it first, a smartcard reader must also be a writer and, to the extent that the smartcard inserted in it is programmable, a smartcard programmer as well.) Smartcard readers compatible with DIRECTV-specific piracy software are of a type of technology known as "Phoenix-compatible" dumbmouse reader/writers and have a specific wiring interface to the serial port of the attached PC; all of the necessary "smarts" must be supplied by compatible software run on an attached host computer. Mostly, smartcard readers compatible with DIRECTV-specific piracy software are not compatible with the PC/SC specification. (The DIRECTV-specific piracy software currently known to us is incompatible with the PC/SC specification, as it is designed to interface directly to a compatible dumbmouse reader/writer.)

Because of certain software vulnerabilities in DIRECTV's P2/H generation of access cards, DIRECTV pirates could for some time use a Phoenix-compatible dumbmouse reader/writer to modify an access card without violating the ISO7816 smartcard standards. DIRECTV has eliminated many of these vulnerabilities, first by sending software updates over the air to the P2/H access cards and later by replacing the P2/H access cards themselves with the P3/HU and P4 access cards. With the P3/HU and P4 access cards, even piracy-compatible dumbmouse reader/writers will not perform the necessary modifications; DIRECTV pirates must thus resort to other electronic devices (such as those described later in this document) to circumvent access card security features. However, dumbmouse reader/writers are still useful to DIRECTV pirates for "emulation," which is described below.

<u>Electronic Countermeasures</u>

DIRECTV periodically sends out electronic signals that target modified access cards. These signals, known as electronic countermeasures ("ECMs"), detect cards modified by pirates and disable them. Some ECMs disable modified access cards by putting the software they run into an endless "loop." When a modified access card is in a loop, it is not capable of receiving DIRECTV signals. Other ECMs irreversibly change the "write once" memory on an access card as a means of preventing it from being used further.

On Sunday, January 21, 2001 DIRECTV sent out a particularly effective ECM that caused an irreversible change to the "write once" area of modified P2/H access cards. That ECM, referred to as "Black Sunday" by pirates, resulted in the disabling of an unknown number of modified access cards that had been used to view DIRECTV's television programming without authorization prior to that date. Black Sunday was extremely effective and left a large number of pirates temporarily without any ability to use DIRECTV's programming without authorization.

### Unloopers

Although "unloopers" originally got their name from their ability to stop the endless loop created by some ECMs that disabled modified P2/H access cards, the same hardware can also be used to circumvent the security features of DIRECTV P3/HU access cards and modify those access cards by "loading" new software or data into the memory. An unlooper device is thus often marketed as an "unlooper/loader" or "HU loader"; other common names for such devices are "smart card repair terminals" and "all-in-ones." We apply the term "unlooper" to any such device.

An unlooper enables a pirate to read and write the software and data stored in a DIRECTV access card's nonvolatile memory. All unloopers include specific electronic components whose sole function is to manipulate the power supply and clock signals supplied to a smartcard in a manner that intentionally violates the ISO7816-3 standard. There is no legitimate application of this voltage manipulation capability, which is often referred to as "glitching."

An unlooper sends a "glitch" to the microprocessor in a smartcard with the intent of causing it to skip an instruction or malfunction in some other way of use to pirates. By glitching at one or more precise times in the smartcard's internal software instruction sequence, the unlooper modifies the behavior of the software in a DIRECTV access card as it runs.

Glitching is an activity that is neither required, recommended, nor condoned by any ISO7816 or other smartcard standard. Smartcard readers don't contain circuitry that delivers a glitch to the inserted smartcard. Unloopers, on the other hand, devote a significant portion of their hardware and cost to providing this standards-violating feature.

Expert Report and Disclosures                                                4/7/2004

All of the unloopers we have examined to date have been designed around an Atmel AVR AT90S2313 microcontroller chip, usually referred to in the DIRECTV pirate community as an "Atmel" or "Atmel chip." In addition to other capabilities, the Atmel chip can store the software it will run in a nonvolatile memory contained on the chip. In order for the unlooper to function, the nonvolatile memory in the Atmel chip must be loaded with "firmware" (a type of software) that controls the glitching function of the unlooper device. In conjunction with pirate PC software, the pirate firmware commands the glitching circuit to glitch in a certain way, at a certain time, and for a certain duration.

Unloopers are often sold with the glitching firmware "pre-flashed." This means that the Atmel chip in the unlooper has already been loaded with the pirate firmware. Other unloopers are sold with "blank" Atmel chips, on which the user must load firmware himself, or with empty sockets into which the user must insert an Atmel chip that is purchased separately. There are various types of pirate firmware; some common names for the versions used by DIRECTV pirates are "SU2" code, "WT2" code, and "WTX" code (also known as "X"). Atmel chips pre-flashed with pirate firmware are at times also referred to by the name of the firmware they contain, e.g., "SU2." An Atmel chip containing different firmware may be inserted into an unlooper, replacing another Atmel chip, in order to "upgrade" the capabilities of the unlooper as new DIRECTV ECMs are reverse engineered by the pirate community. In many unloopers new firmware can be loaded directly into the existing Atmel chip from free downloads available on the Internet.

Hobbyists and professionals can obtain blank Atmel AT90S2313 chips from many legitimate and reliable vendors of electronic components. One popular vendor is Digikey. A blank Atmel chip from such a vendor typically costs well under $5.00. By contrast, vendors selling unloopers and other devices for piracy of DIRECTV charge

12

$30.00 or more for the same Atmel chip pre-flashed with firmware for DIRECTV piracy. Developers of legitimate products looking to purchase Atmel chips in small quantities would have no interest in the pre-flashed pirate firmware and would not purchase pre-flashed chips at their higher prices.

An individual with little technical knowledge and mere possession of an unlooper can easily "flash" pirate code onto an inserted Atmel chip. Most unloopers are designed to make this process easy. The availability of pirate unlooper firmware for free from the Internet reduces almost to zero the work and technical knowledge required to load and use pirate firmware after purchasing an unlooper. The user can simply download the freely available firmware to his personal computer, connect the unlooper to the computer, and "flash" pirate code onto a blank Atmel chip inserted into the unlooper.

Unloopers are specifically designed for the purpose of circumventing DIRECTV's conditional access system. They have no commercially significant purpose other than to modify DIRECTV access cards.

Bootloaders

A "bootloader" (also known as a "DPBB") is a device designed specifically to overcome the effects of DIRECTV's Black Sunday ECM, which targeted modified P2/H access cards. A bootloader is a printed circuit board that is designed to be inserted into an IRD in place of a valid access card and is used in conjunction with a modified P2/H access card. See Figure 3.

Expert Report and Disclosures                                                    4/7/2004



*Figure 3. A bootloader is a device inserted between the access card and the receiver*

Like an unlooper, a bootloader "glitches" the inserted DIRECTV access card. When the IRD tries to start the program on the access card, the bootloader intercepts that signal. Shortly thereafter, it sends its own "reset" signal to the inserted P2/H card. Then, 522 clock cycles later—when the microprocessor in the P2/H card comes to the location in its program where the Black Sunday ECM prevents the P2/H card from continuing—the bootloader delivers a glitch. This causes the P2/H card to continue as if the Black Sunday ECM had never happened. The bootloader's glitch thus modifies the behavior of the access card in such a way that DIRECTV's Black Sunday or similar ECM is overcome.

A bootloader is solely designed for the purpose of circumventing DIRECTV's conditional access system, and thus is only of assistance in the unauthorized decryption

14

of DIRECTV's satellite transmissions of television programming. A bootloader has no purpose or use other than to modify the behaviors of P2/H access cards that were previously modified and subsequently disabled by the Black Sunday ECM. Bootloaders thereby circumvent DIRECTV's conditional access system.

### Emulators

A technique called "emulation" allows a pirate to mimic the functions of an access card in order to circumvent the DIRECTV conditional access system and thus receive all or most of DIRECTV's programming without paying for it. Devices called "emulators" are printed circuit board devices designed to be inserted into an IRD in place of a valid access card.

The user of an emulator inserts the device into the IRD instead of the DIRECTV access card. A cable is then attached from the emulator to a PC's serial port. Emulation software running on the attached PC is then used to mimic the expected behavior of a DIRECTV access card.

As far as we know, no software has been written to emulate the ASIC that generates the decryption keys. Thus, a complete emulation system needs the ASIC on a real DIRECTV access card to generate decryption keys for the IRD. Pirates accomplish this by creating what is known as an "AUX card," which is a modified DIRECTV access card that allows the pirate emulation software to use the ASIC to generate decryption keys.

Typically, therefore, a complete "emulation system" consists of an emulator and a Phoenix-compatible dumbmouse reader/writer containing an AUX card, both connected to a single personal computer ("PC"). See Figure 4.

15

Expert Report and Disclosures                                                          4/7/2004



*Figure 4.  The components of an emulation system*

When the emulator is inserted into the IRD, the IRD thinks it is communicating
with a regular DIRECTV access card and sends and receives data normally.  The
emulator forwards data from the IRD to the user's PC.  The pirate software running on
the PC generates a video decryption key with the help of the ASIC on the AUX card;
this key is then sent back through the emulator to the IRD.  An additional benefit to
pirates using emulation is that the AUX card can be protected from DIRECTV's ECMs
by the emulation system.

Emulators of the type used for DIRECTV piracy are designed specifically for
piracy.  They are not general-purpose devices intended for smartcard software
development and they are not compatible with any such legitimate tool.  The products

called "emulators" that are used in commercially viable, legitimate software development activities have far more sophisticated, complex hardware and software.

Pirate device manufacturers have also created standalone emulation devices that provide unauthorized access to DIRECTV satellite programming by replacing the personal computer in this setup with a dedicated "embedded" computer system that is made part of the emulator device.

### C. Specific Devices at Issue

Netrino expert opinions regarding the design, function, and purpose of the pirate access devices at issue are attached hereto as Schedule 2.  I wrote or have reviewed each of the attached reports.  Based on my examination of the devices at issue and other similar devices, I am in agreement with the analysis and opinions contained in those reports that were written by other experts working for Netrino; I adopt all of the opinions of the attached reports as my own.

### D. Exhibits and/or Demonstrations to Be Used

In addition to the Exhibits attached to Schedule 2, Netrino's testifying expert, and/or DIRECTV may use the following at trial to summarize or support the opinions expressed herein: (1) a sample or specimen of the device(s) at issue; (2) a demonstration of the pirate access software commonly used in conjunction with the devices; and (3) an actual or videotaped demonstration of the devices being used to pirate DIRECTV signal.